MARTHA A. BOERSCH (CABN 126569)
Chief, Criminal Division

RAVI T. NARAYAN (CABN 331858)
Deputy Chief, Criminal Division

MARJA-LIISA OVERBECK (CABN 261707)
LEIF M. DAUTCH (CABN (CABN 283975)
ASEEM P. PADUKONE (CABN 298812)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Tel:   (415) 436-7200
    Fax:  (415) 436-7234
    leif.dautch@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   v.<br><br>MATTHEW ROCHA,<br><br>   Defendant. | NO. 21-CR-236-YGR<br><br>GOVERNMENT'S MOTION FOR DOWNWARD DEPARTURE PURSUANT TO U.S.S.G. § 5K1.1, AND SENTENCING MEMORANDUM<br><br>Sentencing Date:  May 1, 2025<br>Time:               8:00 a.m. |

## I. INTRODUCTION

For Defendant Matt Rocha, the government moves for a downward departure from the otherwise-applicable Sentencing Guidelines and recommends that the Court impose a term of time served, accounting for his 47 months in pretrial custody on a writ. The government also recommends three years of supervised release and a $100 special assessment. Rocha is a former Nuestra Familia member and leader who agreed to proffer with the FBI and U.S. Attorney's Office before he was charged; who provided information about the NF, its leadership, and its activities across at least 15 proffer sessions; and who ultimately testified at the *Cervantes* trial as a cooperating witness.

The government's recommendation of time served for the 47 months Rocha has spent in pretrial custody on a writ balances his activities within the NF against the steps he has taken over the past 6 years to put the gang behind him. He held a leadership role within the NF, overseeing criminal activity both inside and outside California state prisons. But of the three charged attempted murders in the *Cervantes* trial, he did not participate in the attacks involving victims Villagrana and Muzquiz, and he was the victim of the third. In fact, by the time of his attack in July 2019, Rocha had already been demoted by the trial defendants. He ceased all activity with the NF and eventually made the decision to debrief with the FBI, becoming the critical first cooperator in the federal investigation, and culminating in the courageous act of testifying against the top NF leadership in a public trial. A time-served sentence therefore is appropriate considering all of the section 3553(a) factors.

## II.     OFFENSE CONDUCT

Having presided over two Nuestra Familia trials in the past decade, this Court does not need a general overview of the NF, its structure, or its criminal activities. Instead, this section is focused on Rocha's specific involvement in the gang.

After years as an active Norteño gang member in Salinas, Rocha went to state prison for the first time in 1991; he was housed at San Quentin State Prison. Presentence Investigation Report ("PSR") at ¶ 18. While there, Rocha was "pulled" to become an NF member. Rocha was first an "undercover" NF member, appearing to continue to function as a member of the Northern Structure but able to report goings-on to those within the NF structure. *Id*.

In 1992, Rocha won an appeal of his underlying conviction and was released. PSR at ¶ 19. While on parole during that time, Rocha sold drugs, including cocaine and heroin, to other gang members for resale. Rocha held "the bank" for the Monterey County Regiment, and he would collect 25% of illicit income (i.e. profits from drug trafficking, robberies, etc.) from gang members in Monterey County on behalf of the NF and the Regiment. Rocha also collected "voluntary" contributions or "dues" payable to the NF. During this time, Rocha made a large monetary contribution – $10,000 – to the NF bank. *Id.*

In 1993, Rocha returned to custody on a parole violation. PSR at ¶ 20. At Pelican Bay State Prison, Rocha was celled with NF leader Sheldon Villanueva, aka "Skip." Villanueva took Rocha through the indoctrination process, which lasted 4 to 6 months. Rocha was promoted to a CAT-II NF member. The

purpose of the promotion was to prevent others from interfering with Rocha when Rocha was paroled and returned to the streets. *Id.*

In December 1993, Rocha was paroled and returned to Salinas. PSR at ¶ 21. While out, Rocha ran Monterey County as the only NF member on the streets there. He continued to collect contributions and directed 25% of all illicit proceeds to the NF bank. This money was typically sent to NF members, especially those at PBSP in the Secure Housing Unit. *Id*.

In 1996, Rocha was convicted in Monterey County of second degree murder and manslaughter and sentenced to 26 years to life in state prison. PSR at ¶ 23. He re-entered CDCR and was transferred to Pelican Bay State Prison, where he was housed near numerous other NF members, including David Cervantes and James Perez.

Beginning in 2000, multiple federal indictments targeted NF members and associates pursuant to an investigation dubbed "Operation Black Widow." PSR at ¶ 24. As a result, the majority of the NF's leadership at the time ("the Brass") was transferred from PBSP to Santa Rita Jail, and later to out-of-state Bureau of Prisons facilities. In BOP, the Brass was unable to communicate with NF members in California. However, a temporary structure was left in place under Cervantes, the only remaining Category-III NF member at the time. The remaining NF members, including Cervantes, Guillen, Daniel Perez aka "Stork," James Perez aka "Conejo," and others, began to self-appoint and otherwise fill the vacant leadership positions within the NF. *Id*.

During this period, CDCR designated various influential NF members (and other prison gang members) to be housed in the Secure Housing Unit ("SHU") program at PBSP. PSR at ¶ 25. While in the SHU at Pelican Bay, Rocha learned that formal accusations had been filed internally against Guzman, alleging among other things that Guzman had used drugs, proclaimed that he was a General, abused his authority, and shared NF business with his wife, who later testified about NF business at a public trial. *Id*. at ¶ 27. Rocha was asked (as an Inner Council member) for his vote on Guzman's guilt. He submitted a guilty vote. California prison investigators became aware of the threat to Guzman's life by intercepting kites (though Rocha's guilty vote was not recovered) and moved Guzman to a secure location. As a result, Guzman was never attacked. *Id*.

Following a legal settlement in California in approximately 2015, many NF members were released from the SHU to the mainline at various CDCR facilities. PSR at ¶ 26. Outside of the SHU, and with the resulting ease of communication, the gang's activity increased and leadership positions became more formalized. Though the positions were informally set years earlier, the General Council took official form as: Cervantes (GAO), Perez (GOP), Guillen (SRG), Donald Moran (IC), Samuel Luna aka "Sammy" (IC), Rocha (IC), and George Franco aka "Puppet" (IC). Amongst other responsibilities, as an IC member, Rocha advised on matters implicating the NF Constitution, voted on new NF membership, voted on discipline and demotion of NF members, and voted on expulsion of NF members. *Id.*

In 2015, Rocha was transferred to Pleasant Valley State Prison, where he became the Regimental Commander of the prison, as well as the RC of Monterey County (on the streets), overseeing the distribution of drugs and other gang activity in both areas. PSR at ¶ 28. When James Perez was put in administrative segregation for the John Muzquiz attack in 2016, Rocha served as the Acting General of Prisons (GOP). *Id.* at ¶ 29. This was a source of tension between Rocha and Perez that ultimately resulted in Perez filing a complaint against Rocha, Rocha being demoted, and Rocha being attacked in July 2019. *Id.* at ¶ 31. Rocha's demotion was outlined in dozens of wiretap calls played at trial.

On July 18, 2019, Rocha was stabbed by NF associates while still housed at Pleasant Valley State Prison. PSR at ¶ 33. A filter issued by NF leadership shortly after the attack (Trial Ex. 115) detailed allegations of misconduct against Rocha, including misappropriation of NF funds and a plot to overthrow NF leadership and kill Perez after Rocha was demoted to CAT-I. The filter stated that Rocha had been "deemed" and ratified his removal. Joshua Cortez testified that Samuel Luna wrote the filter along with Franco and Guillen, and that Luna told Cortez the filter was issued on behalf of the GC. The jury found true the special finding that all four trial defendants (Perez, Cervantes, Franco, and Guillermo Solorio) aided and abetted in (or reasonably could have foreseen) the attempted murder of Rocha.

III. **GUIDELINES CALCULATION**

The government agrees with Probation's Guidelines calculation. Rocha's Base Offense Level is 33 as a result of his involvement in the conspiracy to murder Lencho Guzman. That is reduced to 30 for acceptance of responsibility. PSR at ¶¶ 38-47. Rocha falls in Criminal History Category V. *Id.* at ¶ 55. That yields an advisory Guidelines range of 151-188 months. *Id.* at ¶ 90.

## IV. MATT ROCHA'S SUBSTANTIAL ASSISTANCE

"Substantial assistance" is evaluated with respect to the factors outlined in Section 5K1.1 of the Sentencing Guidelines. *United States v. Tadio*, 663 F.3d 1042, 1045 (9th Cir. 2011). Those factors include: (1) the significance and usefulness of his assistance; (2) the truthfulness, completeness and reliability of any information he provided; (3) the nature and extent of his assistance to the government; (4) any risks he faced in providing his assistance; and (5) the timeliness of his assistance.

These factors, discussed below, establish that Rocha substantially assisted the government, which merits a downward departure from the otherwise applicable Guidelines range. The government hereby seeks a departure of 6 offense levels (from TOL 30 to 24) to a Guidelines range of 92-115 months, with a further downward variance of approximately 50% to a term of time served for the 47 months he has spent in custody on a federal writ.

### A. Nature of Information Provided and Significance and Usefulness of the Defendant's Assistance

Matt Rocha was arguably the most important cooperator to both the investigation and prosecution of *Cervantes* NF case. He was the government's first cooperator, sitting for approximately 15 proffer sessions in 2020 and 2021 and testifying before the grand jury. He was the highest-ranking NF member to cooperate, having served on the General Council and, for a time, as the Acting General of Prisons. He was also a key trial witness, providing an overview of the entire enterprise, and the only witness to testify about all the murder conspiracies and attempted murders charged in the case. Rocha was also the sponsoring witness for many of the wiretaps introduced at trial, given that Rocha's demotion and eventual attack was a major topic of conversation amongst the defendants.

Rocha also identified most of the trial defendants, described their positions in the NF, and talked about the gang's expansion and criminal conduct following their transfers out of Pelican Bay, including the gang's extensive drug trafficking. He testified about being demoted from the Inner Council, his own attack in July 2019, and his decision to withdraw from the gang. The breadth and depth of his assistance to the government's case was substantial by any measure.

### B. The Truthfulness, Completeness, and Reliability of Information Provided

Rocha's proffer statements and trial testimony about the general functioning of the NF were

corroborated by the six other cooperating witnesses in this case, and by documentary evidence—including the prison kites about the Guzman murder conspiracy, which were seized contemporaneously by prison guards and decoded by FBI cryptanalysts. His identification of the defendants and their roles in the gang was also corroborated by the wiretapped recordings. Rocha's testimony about the Guzman murder conspiracy and his own attack were specifically corroborated by the trial testimony of Donald Moran. Perhaps the most significant proof of Rocha's reliability and truthfulness as a witness is the fact that defense counsel themselves relied on Rocha's trial testimony in their closing arguments, implicitly acknowledging that he was a credible witness.

### C.  Risks Actually or Potentially Incurred by Defendant

The risks to Rocha are not hypothetical – he was "deemed" by the NF in July 2019 and attacked on the yard at Pleasant Valley State Prison. Two NF members stabbed Rocha in the chest with prison shanks, including above the heart and in the solar plexus. And that was *before* he testified in open court about four of the top leaders of the NF. Numerous trial witnesses described the NF's views on informants, a risk that is magnified for an in-custody witness given that the NF is a prison-based gang that operates to circumvent prison safety and security. The danger to Rocha continues to be of the highest order.

### D.  The Timeliness of the Defendant's Assistance

Rocha's cooperation came at a critical stage of the FBI's investigation. By mid-2020, the FBI had intercepted about a year's worth of wiretapped communications, including at the highest levels of the NF. But they did not have a cooperating witness with detailed inside knowledge of the NF, a critical component to any successful RICO prosecution. In September 2020, FBI agents traveled to Pelican Bay State Prison and met with Rocha, who agreed to cooperate with the federal investigation. He began a series of approximately 15 proffer sessions where he laid out the entire history, structure, and membership of the NF, as well as specific attacks and conspiracies that were later charged in the case. He did all of this before being charged. He testified to the same in the grand jury. Rocha's information propelled the investigation forward, resulting in a sprawling indictment against the NF's leadership a year later.

For all of these reasons, the government believes that a downward departure of 6 levels for substantial assistance is warranted. That would result in an advisory Guidelines range of 92-115 months.

## V.   SENTENCING RECOMMENDATION IN LIGHT OF SECTION 3353(A) FACTORS

The government believes that many of these same factors support an approximately 50% downward variance from the newly-calculated Guidelines range to a term of time-served for the 47 months Rocha has spent in pretrial custody on a writ. The Sentencing Guidelines serve as "the starting point and the initial benchmark" of any sentencing process and are to be kept in mind throughout the process. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991 (citation omitted). In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include:

1. the nature and circumstances of the offense and the history and characteristics of the defendant;
2. the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
3. the need for the sentence imposed to afford adequate deterrence to criminal conduct; and
4. the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

While Rocha was not responsible for the three attempted murders charged in this case (and in fact was the victim of one), all agree that his participation in the NF for more than two decades was dangerous and unlawful. He acknowledged, on the stand at trial, his past zeal for and adherence to NF rules, including the violence that was central to the gang's operations. His young adult years were also particularly violent, including convictions for killing two men in Salinas in the early 1990's. For Rocha to ever leave prison, he will need to convince a California state parole board that he no longer poses an unreasonable danger to the public.

But this Court's role is somewhat different, though it may certainly consider Rocha's future dangerousness as a relevant factor under section 3553(a). This sentencing hearing is for Rocha's

conviction for participation in the NF, a gang in which he has not been an active participant for 6 years, a gang that attacked and tried to kill him, and a gang against whose leadership Rocha has publicly testified. Thus, as to the risk that Rocha will return to the type of criminal conduct underlying his federal conviction, that is not a realistic possibility. And even if it were possible, Rocha appears to have turned a corner, moving away from active gang participation in 2018 and 2019, even before he was approached by the FBI or charged federally. And through his cooperation and testimony in a public trial, he helped dismantle the entire leadership structure of a powerful prison gang, bringing to justice the perpetrators of three attempted murders and two murder conspiracies.

The government also notes that it has argued for, and the Court has generally imposed, below-Guidelines sentences even for non-cooperating defendants in *United States v. Cervantes, et al.*, 21-CR-328-YGR, in part due to the fact (as is true for Rocha) that these defendants are also serving lengthy state prison terms. For example, Sammy Luna—like Rocha, an Inner Council member, but who remained active in the gang up to his arrest—was sentenced to a term of 175 months, a more than 50% downward variance from his Guidelines range of 360 months to life. Thus, a sentence for Rocha that primarily accounts for his 47 months of pretrial custody would be commensurate with the government's and Court's broader approach to sentencing in this case.

For all of these reasons, the government believes that the sentencing goals of section 3553(a) are best served by a sentence of time served for the 47 months that Rocha has spent in pretrial custody, combined with three years of supervision, and a $100 special assessment.

Respectfully submitted,

Dated: April 17, 2025

MARTHA A. BOERSCH
Chief, Criminal Division

/s/
MARJA-LIISA OVERBECK
LEIF M. DAUTCH
ASEEM P. PADUKONE
Assistant United States Attorneys